Cite as 2021 Ark. App. 85

# ARKANSAS COURT OF APPEALS
DIVISION II
**No.** CV-20-323

| | | |
|---|---|---|
| FRED-ALLEN SELF | | **Opinion Delivered:** February 24, 2021 |
| | APPELLANT | |
| | | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT |
| V. | | [NO. 72DR-19-1398] |
| JENNIFER DITTMER | | |
| | APPELLEE | HONORABLE JOANNA TAYLOR, JUDGE |
| | | AFFIRMED |

## RITA W. GRUBER, Judge

Fred-Allen Self appeals the Washington County Circuit Court's denial of his request to modify custody from joint custody to primary custody with him. On appeal, he argues that the court clearly erred when, after finding a material change in circumstances based on the parties' inability to cooperate and communicate, it failed to find that the best interest of the children warranted termination of joint custody. We affirm.

Jennifer Dittmer and Fred-Allen Self were divorced in 2012 in Wisconsin and entered into a marital settlement agreement, which, among other things, provided for joint legal and physical custody of their three daughters.[1] Sometime after the divorce, the parties moved to Northwest Arkansas and continued to exercise alternate-week custody of the children. On August 8, 2019, Dittmer filed a petition to register the Wisconsin divorce

---

[1] At the time of the final hearing in this case, LS was 13, BS was 9, and ES was 7.

decree and a motion to modify the decree and award primary custody to her. She contended that communication between the parties had broken down to the extent that joint custody was no longer feasible. Self responded and also filed a countermotion to modify the decree, alleging that there had been a material change in circumstances warranting modification concerning the children's health and well-being and that it was in the best interest of the children for him to be awarded primary custody.

The circuit court appointed an attorney ad litem for the children and held a temporary hearing on October 28, 2019. In an agreed temporary order, the court continued joint custody; instituted various rules regarding bedtimes, medical treatment, and a few other items; forbade either party from making derogatory comments about the other parent to the children; ordered coparenting counseling; and ordered the parties or the ad litem to find a separate therapist for LS. The temporary order was entered on January 3, 2020.

The circuit court held a final hearing on February 3, 2020. Testimony at the final hearing demonstrated that LS had been diagnosed with anxiety and depression; had, at times, engaged in self-harming behavior; and had often acted out when in Dittmer's custody. The evidence was clear that LS and Dittmer had a strained relationship, but it was less clear what or who was responsible for the disharmony. Examples of the disharmony included LS's throwing a potato and hitting Dittmer in the head with it when she was angry with her, LS's written "escape plan" in the event things got so bad at Dittmer's house that she had to leave, and LS's repeated outbursts at Dittmer's home. In addition, the parties testified that they had been unable to agree about medical decisions, including vaccinations, medications prescribed for the children, and recommended medical treatment for aches and pains.

2

Evidence indicated that the two younger children related well with both parents. In addition, testimony indicated that all three children were involved in extracurricular activities, earned good grades, and were well-behaved at school.

Self testified that there had been a major breakdown in communication between the parties in the previous two years and that coparenting counseling had not gone well. He testified that he has a degenerative medical condition—Ehlers-Danlos syndrome (EDS)—that causes the connective tissue in his body to break down, resulting in chronic pain and daily dislocations. LS and ES had been tested by a geneticist, and both suffer from the same condition, which requires them to pay more attention to aches and pains than a typical person. Self said people with this disorder cannot safely do many simple things that most kids do, like jumping jacks, because it breaks down their joints. He said that ES constantly complains of back, neck, and knee pain and that LS's knee randomly dislocates and causes her constant pain. Self opined that Dittmer did not believe the girls suffer from this condition. He expressed concern that she had taken the girls to a chiropractor, which he said is "strongly contraindicated" for people with EDS. He also said that Dittmer was not consistent about giving the girls their prescribed medications for allergies, reflux, and pain management. Self said he has a great relationship with all three children and that they regularly confided in him when things were difficult. He also said that he had remarried and that the children have an excellent relationship with his husband.

Dittmer said that in addition to the three girls, both her parents and her three-year-old daughter, LMS, live with her. She agreed with Self they had made no progress in coparenting counseling and that the parties had serious difficulty communicating. She

3

testified that she and Self had different ideas regarding bedtimes, medical issues, and screen time. She did not dispute that LS and ES suffer from EDS, and she agreed with Self on their treatment plan.

LS testified that her mom told her she had "filed against" her dad and requested full custody. She told LS "something about maybe never seeing [Self] again if the judge decided." LS said this caused her anxiety to get a little worse but that her dad reassured her that things would be okay "no matter what." She said living with her dad was more "laid back" than living with her mom, giving bedtime and screen-time limits as examples. She said there is a lot of yelling at her mom's house. She also said that her mom had put cameras in the house—one facing directly at LS's door—which made her uncomfortable. She testified that she feels more welcome and safer at her dad's house and would prefer to spend more time with him.

Carrie Nichols testified that she had been LS's counselor off and on since November 2016, sometimes as her primary therapist and sometimes in family sessions. She said that she had seen Dittmer and LS together since August 2019, that she was also seeing Dittmer individually, and that LS was seeing another therapist individually. She said that there was a lot of arguing, disrespect, defiance, misunderstandings, and poor communication between Dittmer and LS. She expressed concern that LS's relationship with Self might be "negative or interfering with her relationship with [Dittmer]" and that he might be causing parental alienation. However, her opinion was that regardless of where or with whom the children lived, they were at risk because the problem was systemic: the parents cannot get along and have prioritized fighting and blaming over parenting. She opined that "whether we change

4

it and have the children with one parent, both parents, leave it the same, there's the risk no matter what."

In her closing argument to the court, the ad litem recognized that LS did not see her mother as an ally and that it was imperative to address this issue and improve LS's willingness to engage and change this dynamic. She advised, however, that the parties continue to share custody and explained, "I don't think the schedule is the problem. The girls have been doing week-on/week-off for years. It hasn't affected their grades. It hasn't affected their behavior at school." She also told the court that all three children had said that they preferred to spend more time with dad.

At the close of the hearing, the circuit court found that there had been a material change in circumstances but did not change joint custody. The court identified the problem as a "failure to communicate." It recognized that both parents love the children, the children love both parents, the parents are both "capable of being good parents," joint custody had worked from 2012 until recently, and the issues "basically" concerned LS. The court also stated that it had heard no testimony that either parent mistreated LS. The court was less concerned that LS, as a teenager, was capable of "drum[ming] up . . . drama" and more concerned about the parties' inability to communicate and work together to address these issues.

> So, in not communicating with each other, you have given away your power as parents. Because you get frustrated with LS or you get angry with LS or you're scared of what LS is going to do. That is a powerful position for a child to be in with her parents. So, you all have got to change the balance of power.

> I find that there has been a material change in circumstances for all of the reasons that I just laid out with regard to LS, and the lack of ability to communicate with each other.

And as a result of your inability to communicate with each other, you are unable to act collectively in LS's best interest.

. . . .

So, there has been a material change in circumstances. So, what is this Court to do to make it better? What is best for these three little girls as far as their parents are concerned? Well, you all are doing some things absolutely right. You have children that can behave themselves in public, that make good grades, and that active in activities and other people like them. Those are really good things. Because believe me, I hear about some kids that can't do any of those things and it is heartbreaking. Heartbreaking. So, I'm telling the two of you that what you have got to do is communicate with each other. I'm leaving you with joint custody. I don't see that changing custody is going to make any difference in this equation at all. And, in fact, it might upset things in a way that we can't even predict. And if I can't see a clear reason for change then I am not going to order change. So, joint custody is the custody order of the day, it's staying the same.

Now, there are things that are going to change. I do find that it is in the children's best interest that there be some big modifications in the way the two of you deal with each other or don't deal with each other.

The court then enumerated various requirements for moving forward including regular telephone calls between the parties, open communication, refraining from speaking ill of the other party to the children, therapy for all parties, and continued coparenting classes.

In its written order, the court found that a material change in circumstances exists in that "the parties do not effectively communicate for the best interest of their children," and it found it was "in the best interests of the minor children for joint custody to remain because the evidence presented today did not indicate a clear reason for a change of custody or to the visitation schedule." Self appeals, contending that the circuit court clearly erred in failing to modify custody after finding the existence of a material change in circumstances based on failure to communicate. He argues that this type of material change in circumstances requires termination of the joint-custody arrangement.

This court performs a de novo review of child-custody matters, but we will not reverse a circuit court's findings unless they are clearly erroneous. *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Smith v. Parker*, 67 Ark. App. 221, 998 S.W.2d 1 (1999). We recognize and give special deference to the superior position of a circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Sharp v. Keeler*, 99 Ark. App. 42, 256 S.W.3d 528 (2007). For a circuit court to change custody of children, it must first determine that a material change in circumstances has transpired from the time of the divorce decree and then determine that a change in custody is in the best interest of the children. *Stibich v. Stibich*, 2016 Ark. App. 251, at 4, 491 S.W.3d 475, 478.

Self does not challenge the court's finding that a material change in circumstances exists in this case due to the parties' failure to communicate. He argues that the type of material change found here particularly affects the best interest of the children and requires termination of joint custody. He cites *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751 (*Montez I*), and *Montez v. Montez*, 2018 Ark. App. 55, 539 S.W.3d 630 (*Montez II*), in support of his argument.

We disagree with Self's interpretation of our caselaw. We have held that when parties have fallen into such discord that they are unable to cooperate in sharing physical care of their children, this constitutes a material change in circumstances affecting the children's best interest. *Montez v. Montez*, 2019 Ark. App. 61, at 3, 572 S.W.3d 401, 404 (*Montez III*). And we have reversed a circuit court's award of joint custody when there was significant

7

hostility of a level and/or duration such that the parties were unwilling or unable to cooperate in reaching shared decisions. *See, e.g.*, *Montez II*; *Hewett v. Hewett*, 2018 Ark. App. 235, 547 S.W.3d 138; *Stibich*, 2016 Ark. App. 251, 491 S.W.3d 475. But we have not taken away from the circuit court the decision whether joint custody is in the best interest of the children when the court has found that a material change in circumstances exists, even when that material change is based on parental discord and failure of cooperation. *See, e.g.*, *Montez III* (affirming award of sole legal custody but 50/50 shared "parenting time" where parents unable to cooperate and communicate on shared decisions affecting the children); *Hoover v. Hoover*, 2016 Ark. App. 322, at 4, 8, 498 S.W.3d 297, 299, 301 (affirming award of joint custody where, although a "significant level of animosity" and "considerable" difficulty in communication and cooperation existed between the parties, record demonstrated both parties were capable parents who love their children and were equally involved).

Modification of custody is still a two-step process: first, the circuit court must determine whether a material change in circumstances has occurred since the last custody order; second, if the court finds that there has been a material change in circumstances, the court must determine whether a change of custody is in the child's best interest. *Shell v. Twitty*, 2020 Ark. App. 459, at 4, 608 S.W.3d 926, 929–30. The best interest of the children is the polestar in every child-custody case; all other considerations are secondary. *Skinner v. Shaw*, 2020 Ark. App. 407, at 11–12, 609 S.W.3d 454, 461. Moreover, the crux of these cases is that a child-custody determination is fact specific, and each case ultimately must rest on its own facts. *Hoover*, 2016 Ark. App. 322, at 9, 498 S.W.3d at 302.

Self also contends that the circuit court clearly erred in continuing joint custody because it is in the best interest of the children for him to be awarded primary custody since he follows medical recommendations of the children's doctors, maintains a more peaceful home environment, and has good communication with the children. Self essentially asks us to reweigh the evidence, which we will not do.

The circuit court recognized the parties' lack of communication and the effect on their ability to effectively coparent LS. Testimony also clearly indicated that the parties had differing views on a number of issues, including bedtimes, screen-time limits, and medical issues. But the court noted that both parents love the children, the children love both parents, the parents are both capable of being good parents, and the children were doing well at school and in their various extracurricular activities. Moreover, LS and Dittmer's counselor testified that the problem was a result of discord and lack of communication and that changing physical custody of the children would not solve the issues. The attorney ad litem agreed and advised the court to continue shared custody.

The court specifically found that changing custody was unlikely to make any difference and might upset things. The court did, however, institute certain modifications to address the issues. The court ordered the parties to communicate by phone every Sunday, Tuesday, and Thursday evening to discuss the children's upcoming activities, behavior, health, appointments, and any changes in either home. Both parties and LS were ordered to continue in therapy and follow the recommendations of the therapist. The parties were ordered to refrain from making any derogatory comments about the other parent in the presence of the children and to encourage a loving, meaningful relationship with the other

parent. The parties were to follow the recommendation of the children's doctors regarding vaccinations and medical issues. Finally, the court forbade the parties from discussing the case with the children or allowing anyone else to do so. The court listened to the testimony and had the ability to judge the credibility of the witnesses. It then attempted to tailor its decision to the facts of this case and the best interest of these children. Whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, and we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Wadley v. Wadley*, 2019 Ark. App. 549, at 2, 590 S.W.3d 754, 756. We will not substitute our judgment for that of the circuit court, which observed the witnesses firsthand. Accordingly, we hold that the circuit court's decision was not clearly erroneous, and we affirm.

Affirmed.

VIRDEN and BARRETT, JJ., agree.

*Elizabeth J. Finocchi*, for appellant.

*Andrea D. McCurdy*, for appellee.