Cite as 2022 Ark. App. 48

# ARKANSAS COURT OF APPEALS
### DIVISION II
**No.** CV-21-99

| | |
|---|---|
| FRED-ALLEN SELF | **Opinion Delivered** February 2, 2022 |
| APPELLANT | |
| | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72DR-19-1398] |
| V. | |
| JENNIFER DITTMER | |
| APPELLEE | |
| | HONORABLE JOANNA TAYLOR, JUDGE |
| | AFFIRMED |

## RITA W. GRUBER, Judge

Fred-Allen Self appeals the Washington County Circuit Court's modification of the

parties' custody arrangement from joint custody to primary custody with appellee Jennifer

Dittmer, the children's mother. He argues that the circuit court erred in (1) allowing

evidence of a text sent before a previous custody order; (2) misstating facts in its ruling; (3)

finding it was in the best interest of the children to grant primary custody to Dittmer; and

(4) denying his motion to reconsider. We affirm the circuit court's order.

Dittmer and Self were divorced in 2012 in Wisconsin and entered into a marital

settlement agreement that, among other things, provided for joint legal and physical custody

of their three daughters.[1] Sometime after the divorce, the parties moved to Northwest

Arkansas and continued to exercise alternate-week custody of the children. On August 8,

---

[1]At the time of the final hearing in this case, LS was 14, BS was 10, and ES was 8.

2019, Dittmer filed in the Washington County Circuit Court both a petition to register the Wisconsin divorce decree and a motion to modify the decree and award primary custody to her, contending that communication between the parties had broken down to the extent that joint custody was no longer feasible. Self countered and asked the court to award primary custody to him. The parties have been in continuous litigation since then.

The court held a hearing in February 2020 and entered an order on March 12, finding that there had been a material change in circumstances due to the parties' inability to communicate but continuing the joint-custody arrangement. The court reasoned from the bench that both parties love the children and that joint custody had worked well until recently. The court stated specifically that it could not see "that changing custody is going to make any difference in this equation at all. And, in fact, it might upset things in a way that we can't even predict. And if I can't see a clear reason for change then I am not going to order change." *Self v. Dittmer*, 2021 Ark. App. 85, at 6, 619 S.W.3d 43, 46–47. Self appealed that decision, which we affirmed on February 24, 2021.

The case now on appeal was initiated on March 10, 2020, two days before the written order was entered in the above-mentioned case, when Self filed a motion for contempt, alleging that Dittmer had failed to follow medical recommendations from the children's medical providers regarding LS's inhaler, ES's nasal spray, and LS's HPV vaccine. He also alleged that Dittmer continued to "disregard the possibility" that LS and ES have inherited Ehlers-Danlos syndrome from him and that she failed to follow the recommendations in their diagnoses. All of these issues were litigated throughout the first case. On August 10, before the hearing on the contempt motion, Self filed a motion for medical authority. On

September 14, Dittmer filed a motion for contempt and for emergency modification of custody requesting primary custody with Self having supervised visitation. Self responded and requested a modification of custody with primary custody in him; he also asked that the court order Dittmer to submit to a psychological examination.[2]

A hearing was held over two days—October 23 and November 10. The children testified outside the presence of the parties and each other, and their testimony was not made available to the parties. Both parties and Healey Ikerd, counselor for Dittmer and LS, also testified. At the conclusion of the hearing, the ad litem summarized her opinion for the court.

The ad litem had served in the first case and was reappointed to serve in this case. She informed the court that after the February 2020 hearing, LS and Dittmer had made a lot of progress in joint counseling with Ikerd. She said Ikerd told her there had been a breakthrough, and the ad litem said that she could see the difference between LS and her mother when she reentered the case. She said Ikerd noticed that LS had stopped participating in therapy as the court date in this case got closer and after Dittmer filed her motion for emergency custody. The ad litem told the court that LS indicated Self had informed her how to go online to see court documents. She said there was "no doubt in [her] mind that dad is sharing very adult matters with these children." The ad litem was concerned that the relationship between Dittmer and BS had broken down in a manner similar to the breakdown in Dittmer and LS's relationship that was a subject of the previous case. She said she did not believe the girls were abused or neglected at Dittmer's home but that they would

---

[2]This request was later withdrawn.

3

"run to dad" whenever something did not go their way at Dittmer's. The ad litem was concerned that this left Dittmer on "damage control" for several days each time the girls visited Self. She informed the court that the girls told her they wanted to "live with dad," but they were unable to articulate what schedule they wanted or how this might be different. They told her that Self would let them see Dittmer whenever they wanted. She was concerned with Self's ability to have appropriate boundaries with the children and refrain from discussing certain issues. She opined that joint custody simply was too "volatile" given the lack of communication and that Dittmer should have primary custody.

On November 12, 2020, the court presented its extensive oral ruling comprising over thirty pages of the record on appeal. The court prefaced its findings by reminding the parties that it had implored them in the previous trial to make every decision with "an eye for their children's best interest" and to stop "battling each other." The court reminded them that it had found a material change in circumstances but had determined it to be in the children's best interest at that time to continue joint custody. The court said it had never seen the interaction between parents devolve to such "an abyss" as had the communications between these parties. It then presented a detailed review of the evidence.

The court referred to the previous order's requirement that the parties engage in coparenting with Mary Jeppson and follow her recommendations. It then reviewed Jeppson's emails indicating that Dittmer had participated in coparenting and that Self had failed to communicate or meet with Jeppson since the coparenting plan was put in place. The court recalled Self's testimony that he was advised by his lawyer not to continue in coparenting in clear violation of the court's March 2020 order.

4

The court then referred to its previous order's requirement for the parties to talk on the phone three evenings a week to discuss the children, their behavior, their health, and upcoming appointments. The court went through email exchanges between the parties making it clear that "neither party trusts the other's interactions with the children's doctor" and that it was clear that "there needs to be one parent handling all of the children's medical decisions without any input or involvement from the other parent." The court then detailed numerous emails between the parties—seven pages—demonstrating Self's continuing argument about medical and school issues in spite of what it considered reasonable conduct on Dittmer's part. Because so much of this case and the court's ultimate decision involves the court's determinations of weight and credibility, we find it necessary to include a few examples of the court's review of the evidence:

> May 1st, here we go, there's more communication that just goes bad before it's good. On May 1st at 1:55 p.m. mom sends what I would call a comprehensive email to dad that says, "All the girls had a good week," and it goes on to say, "[LS] got a refill on her meds, [ES] got the right nose spray. She will need a refill on it in the next few days." There's more report on [LS] and some appointments. There's more report on [BS] "having some minor issues today with attitude and she's grounded from her tablet for the rest of the day for slamming it on the table." There's more information about schoolwork. Everything that I see [in] that May first exchange at 1:55 p.m. from mom to dad is reasonable and appropriate for joint custodians, who are coparenting their children to share with each other.

> Dad responds at 1:58, 3 minutes later, "In the future please only include relative things not passive aggressive digs like the nose spray and [LS] having to catch up. If you have a problem with something here, address it directly not this ridiculousness. If there is something you should know I will tell you."

> Then, at 2:01, 3 more minutes later he responds again and says, "For your information, [LS] knew there were some things not yet complete she was planning to do it the next week as it wasn't actually sure yet" — I think it was supposed to be

due please just go ahead and assume that I know what is going on with her schooling and leave it at that."

Well, coparents do not assume that the other parent knows everything. That is me talking.

One minute later, mom responds, "What she had to complete last Saturday was due last Friday."

And dad responds, "No, I looked over things with her on Friday and she was caught up with everything at that point. Again, assume I know what's happening and don't passive aggressively call me out with comments like this which you do" — in all caps, "ALL THE TIME."

Mom responds, "Assuming is dangerous and causes misinformation. That is why I have updated with what is complete and not and [LS]'s agreement." I'm not sure but that should have said, and yours and [LS]'s agreement, but I'm not positive about that.

"No, science doesn't have a specific date due, but teaching responsibility so she doesn't procrastinate until the last minute is a good skill." That is a reasonable response.

And then dad responds, "You will not lecture me on this. I will not argue with you" All evidence to the contrary says the Court.

Dad says, "Stop the passive aggressiveness and stop trying to educate me on how stuff works. Do not reply again," says dad.

Then dad writes again, without mom replying, "And maybe, just maybe, if you listen to [LS], you will learn she was not procrastinating and was waiting for a reason. But no, you always know best and [LS] and I are both stupid. Thanks for trying to make me look like the bad guy, though, by saying she had to catch up on something that wasn't actually due then admitting it." Really?

Thankfully in that particular email exchange, Ms. Dittmer did not take the bait and continue to argue about that.

The court then summarized the testimony of LS's counselor, Ikerd, who had worked on repairing the relationship between Dittmer and LS since the previous hearing in March

2020. The court said Ikerd testified that there had been improvement in the mother/daughter relationship and that Dittmer was using suggestions from Ikerd that were making things better. The court described Ikerd's testimony as indicating that LS had regressed in the weeks leading up to the October 2021 hearing, that LS told Ikerd she had some pushback from Self, that nothing negative had been said about Self in the sessions, and that she had never met him but that the relationship between Dittmer and LS was strained due to Self's not wanting them to have a good relationship.

The court then reviewed evidence regarding a visit with LS to the emergency room, which devolved into an argument between the parties such that one of them had to leave. And then the court focused on another email exchange between the parties regarding the children's schoolwork:

> Then on the 18th Sunday, mom writes, "Okay so [LS] finished the health and Civic and did quite a bit of her math this week. She was doing really good trying to catch up and get finished and she had a better time in the spring doing them one at a time like this."

> "[BS] has a few pictures attached. We had to go back and write down what she hadn't actually completed and got a lot of it done. She worked super hard and I was so proud of her. She needs to go back and submit work correctly for the lessons that don't have checkmarks plus her daily work this week. Math, she got completely caught up in."

> "[ES] started the week having to finish up lesson 14 on Zearn, instead of being finished with 16 and caught up as you had mentioned she would be. She got caught up and finished with both lessons for the current week as well. She also went back and we worked together on her iReady math since she was just doing the game and not the lesson part."

> So dad responds, "I will thank you to stop lying to me. [ES] did complete through lesson 16. I completed it with her. Also Ms. Tyree called you out by telling us both that she only did 13 minutes of math the entire week. These attempts to make me look bad are really getting old."

And then he also responds immediately, one minute later, "Also, please remember I have access to everything on her schooling too. I do not need you to lie to me about what's happening."

Mom responds eight hours later, "Yes, she had only done 13 minutes of the lesson part because she was on the game part. That's why I sat with her and helped her work through the lesson to get her time done for the week."

This is from Mr. Self's side, an example of a really bad communication. And what he does is ends up in multiple situations asking mom not to communicate with him. "Stop telling me things I already know." Well, you know what, life is full of repetition.

The court then discussed a text exchange between Self and BS in which BS, while at Dittmer's home, told Self that she wanted to run away. The court found that the exchange between them was appropriate, but it was concerned that there was no evidence introduced that Self informed Dittmer about the issue. The court recognized there might have been communication between the parties but found it hard to believe there was, stating that in a case "of this nature," if there had been an email, call, or text, it would have been put into evidence. The court reiterated that it was important for coparents to know what is going on at the other's home, noting that it had stressed this multiple times in this case, and yet "a threat to run away by a ten-year-old child goes unreported to mom."

The court then reviewed the evidence regarding an ankle injury LS sustained while at Dittmer's home. The court relayed that Dittmer, who is a registered nurse, treated the injury with ice and ibuprofen but decided an x-ray was unnecessary at the time. Self decided an x-ray was necessary when LS arrived at his home several days later. The court was not bothered by the difference in opinion between the parties but by Self's handling of the situation. Self did not inform Dittmer and turned off LS's location services so Dittmer would not show up at urgent care. The court also noted that, after the doctor's examination, LS

8

was not given a cast, crutches, follow-up care, or a referral to an orthopedist. The court found Self's behavior was not in line with the parties' duty to communicate and coparent.

Finally, the court turned to its order of March 2020 in which it forbade the parents from discussing the case with the children or allowing third parties to do so. The court then referenced plaintiff's exhibit No. 10, a text exchange between LS and Self in which Self tells LS she can look up documents on CourtConnect and sends her a document. The court stated that when Self was asked about this text exchange, he testified that LS was asking questions about what Dittmer had filed. The court was concerned with Self's testimony that LS's questions to him somehow excused his telling LS she could look it up on CourtConnect, and "if your mom asked you about it, lie to her and tell her you found it on your own."

In its written order entered on November 20, 2021, the court found that there had been a material change of circumstances, that it was no longer in the children's best interest to remain in the joint custody of the parties, and that Dittmer would have sole custody with standard visitation to Self. The order contained the following in support of its decision:

6. The Court considered every word of testimony and every detail of all documents admitted into evidence, and spent time reviewing many of these details in explaining the findings of fact and ruling to the parties.

7. Based on the facts outlined by the Court, the Court finds that there has been a material change of circumstances and that it is no longer in the children's best interest to remain in the joint custody of the parties.

8. The testimony of the children corroborated the Court's findings of fact.

9. Mr. Self has acted in direct defiance of the specific order that the parties are to foster a loving and meaningful relationship with the other party, regarding communication with the other parent, regarding discussing this case with the children, and regarding coparenting classes with Mary Jeppson.

9

10. The testimony of Healy Ikerd, counselor for Plaintiff and the oldest child, showed alienation by Defendant as to Plaintiff's relationship with this child.

11. [The court set forth sole custody for Dittmer and specific visitation times for Self.]

12. The Court has taken into consideration the testimony of the children and the Attorney Ad Litem's recommendation and the expressed wishes of the children to live at their father's house, as well as every word of testimony and every detail of each document admitted into evidence.

I. *Evidence From Before Prior Hearing*

For his first point on appeal, Self argues that the circuit court erred by allowing into evidence texts that occurred before the February 2020 hearing. He claims that although the court allowed the text exchange into evidence for impeachment purposes, the court was "heavily influenced" by the texts to his detriment. He claims that he cannot have been in violation of a court order for an action taken before the order was entered. On review, we will not reverse the circuit court's decision to admit or refuse evidence in the absence of an abuse of that discretion and a showing of prejudice. *Williams v. Liberty Bank*, 2011 Ark. App. 220, at 11, 382 S.W.3d 726, 735.

The exhibit at issue consisted of three screenshots of text messages between Self and LS and was introduced by Dittmer when Self specifically denied having shown his daughters how to look up public records. The text exchange provided in pertinent part as follows:

SELF: You know you can look it up on Arkansas Court Connect, right?

LS: And I tried getting them to see my side yesterday, but whatever I said was wrong.

SELF: It's because of money.

LS: I know.

10

SELF:  What did she tell you?

LS:  Basically that we need to get stability what she did to get that.

SELF:  Wow. I don't even know what to say. Were your sisters unhappy?

LS:  Ya.

SELF:  If mom asks how you got it just tell her that you looked it up online.

LS:  It's downloading.

They then discuss Halloween plans, and the following attachment sent from Self to LS appears in the text exchange: "Docket Report Results – Not an Official Document from caseinfo.arcourts.gov." Self tells LS that it is "under Exhibit A . . . towards the bottom."

Self objected to the evidence, claiming that the texts occurred before the prior hearing in the case and were inadmissible. The court allowed the exhibit as a prior inconsistent statement for impeachment purposes. On appeal, Self does not argue that the court's determination that the evidence was admissible for impeachment was error; rather, he argues that the court ultimately "relied heavily" on the evidence, referenced it as one of the important reasons for its decision, and made a "significant error" in relying on it to change custody.

First, because Self makes no argument that the court abused its discretion by admitting the evidence as a prior inconsistent statement, we do not address whether the court erred in doing so. Second, to the extent he argues that he cannot have been in violation of a court order for an action taken before the order was entered, Self has not appealed any issues regarding contempt for violation of an order. Rather, Self's contention is that the court's custody analysis was improper. Moreover, we note that although the

11

court's order finds that Self violated its previous order, it does not specifically indicate how, and the court declined to hold him in contempt. Third, the court's oral ruling—which appears to be the source of Self's concern—comprises thirty pages, much of it detailing the emails, texts, and testimony introduced in the case, of which this exhibit was a very small part. And while the court stated in this ruling from the bench that the text exchange bolstered the testimony of Healey Ikerd regarding Self's alienation of mom's relationship with the children, the court did not mention the text exchange at all in its written order, which stated simply that Ikerd's testimony showed alienation by Self as to Dittmer's relationship with LS. The written order controls. *Nat'l Home Ctrs., Inc. v. Coleman*, 370 Ark. 119, 121, 257 S.W.3d 862, 863 (2007). Whatever errors the court may have made, the alleged errors of which Self complains do not appear in the court's written order. *See Anderson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 401, at 10, 608 S.W.3d 915, 921 (holding that written order controls over oral ruling where circuit court found necessary statutory grounds for termination by "substantial evidence" in its oral ruling but corrected its mistake by finding grounds by "clear and convincing evidence" in the written order). A court is free to alter its decision after its oral ruling upon further consideration of the matter. *DFH/PJH Enters., LLC v. Caldwell*, 373 Ark. 412, 414, 284 S.W.3d 66, 68 (2008). Finally, the court's order provides that the court considered "every word of testimony and every detail of all documents admitted into evidence." To the extent that the court considered improperly admitted evidence, we will not reverse absent a showing of prejudice, which was not demonstrated here. We will not second guess the circuit court's determinations

regarding weight of the evidence and credibility of the witnesses. *See Cooper v. Merwether*, 2018 Ark. App. 282, 549 S.W.3d 395.

## II. *Misstatement of Facts*

For his second point on appeal, Self contends that the circuit court misstated facts in its ruling by stating that the text exchange between him and LS about CourtConnect "bolstered the testimony of Healey Ikerd regarding alienation by dad as it relates with mom and the children," arguing that Ikerd actually testified that she had no "first-hand knowledge" of any alienation. He also challenges the court's assumption that he did not contact Dittmer about BS's text about running away.

Our standard of review following a bench trial is whether the circuit court's findings are clearly erroneous or clearly against the preponderance of the evidence. *Cochran v. Bentley*, 369 Ark. 159, 165, 251 S.W.3d 253, 259 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. *Bohannon v. Robinson*, 2014 Ark. 458, at 7, 447 S.W.3d 585, 589.

First, we note that Self is again picking apart selected sentences from the court's oral ruling to support his argument that the circuit court misunderstood the evidence, interpreted it differently than he would like, and made credibility determinations with which he disagrees. We simply do not agree with his contention. His argument mischaracterizes the court's analysis by taking a few sentences out of context from the entire ruling and the court's written order. Our review of the testimony does not convince us that the court

13

misstated any facts. Whether the circuit court's findings are clearly erroneous turns largely on the credibility of witnesses, and we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest in these cases. *Wadley v. Wadley*, 2019 Ark. App. 549, at 2, 590 S.W.3d 754, 756. We will not substitute our judgment for that of the circuit court.

III. *Sufficiency of Best-Interest Determination*

Self also challenges the circuit court's best-interest determination, arguing that it erred in granting primary custody to Dittmer when all three children expressed a preference for living with Self and in completely disregarding many "red flags" in the children's testimony. He contends that both parents discussed the case with the children and gave numerous examples of his view that Dittmer did not adequately care for the children's medical needs.

This court performs a de novo review of child-custody matters, but we will not reverse a circuit court's findings unless they are clearly erroneous. *Taylor v. Taylor*, 353 Ark. 69, 110 S.W.3d 731 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Smith v. Parker*, 67 Ark. App. 221, 998 S.W.2d 1 (1999). We recognize and give special deference to the superior position of a circuit court to evaluate the witnesses, their testimony, and the child's best interest. *Sharp v. Keeler*, 99 Ark. App. 42, 256 S.W.3d 528 (2007). The best interest of the children is the polestar in every child-custody case; all other considerations are secondary. *Skinner v. Shaw*, 2020 Ark. App. 407, at 11–12, 609 S.W.3d 454, 460–61.

Self contends that the ad litem stated all three children expressed a preference to live with him, and this fact "was not included in the court's ruling, and apparently not considered." Not only was it included and considered, but the court stated specifically in its written order that it had "taken into consideration the testimony of the children and the Attorney Ad Litem's recommendation and the expressed wishes of the children to live at their father's house, as well as every word of testimony and every detail of each document entered into evidence." We recognize that a circuit court may consider a child's preference but that the preference is not binding and is simply a factor to be considered by the circuit court. *Faulkner v. McCain*, 2020 Ark. App. 541, 613 S.W.3d 746.

Again, Self asks us to reweigh the evidence and reassess credibility. We will not substitute our judgment for that of the circuit court, which observed the witnesses first-hand. For years, the circuit court had the benefit of witnessing this family, seeing the parties' inability to communicate and foster a positive environment in spite of its orders, and evaluating its effect on the children. The crux of these cases is that a child-custody determination is fact specific, and each case ultimately must rest on its own facts. *Self*, 2021 Ark. App. 85, at 9, 619 S.W.3d at 48. We hold that the circuit court's decision was not clearly erroneous.

## IV. *Denial of Motion to Reconsider*

Finally, Self contends that the circuit court erred in denying his posttrial motion to reconsider. He argues it was erroneous for the court not to reconsider in view of the "egregious mistakes" the motion "brought to light." However, Self does not identify any specific mistakes nor does he explain how the court erred in its denial. We cannot and will

not speculate regarding alleged errors. We have frequently stated that we will not consider an argument, even a constitutional one, when the appellant presents no citation to authority or convincing argument in its support, and it is not apparent without further research that the argument is well taken. *Hollis v. State*, 346 Ark. 175, 55 S.W.3d 756 (2001). We will not do research or develop arguments for litigants. *Hester v. State*, 362 Ark. 373, 386, 208 S.W.3d 747, 754 (2005).

Affirmed.

VAUGHT and MURPHY, JJ., agree.

*Elizabeth J. Finocchi*, for appellant.

*Andrea D. McCurdy*, for appellee.