Cite as 2024 Ark. App. 611

# ARKANSAS COURT OF APPEALS

DIVISION IV
NO. CV-23-547

| | |
|---|---|
| KRISTEN MCGREGOR CLINE (FORMERLY SIMPSON) | **Opinion Delivered** December 11, 2024 |
| APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04DR-20-289] |
| V. | |
| LEONARD 'DALE' SIMPSON | HONORABLE XOLLIE DUNCAN, JUDGE |
| APPELLEE | AFFIRMED IN PART; MODIFIED IN PART |

## STEPHANIE POTTER BARRETT, Judge

Appellant Kristen McGregor Cline (formerly Simpson) appeals from the Benton County Circuit Court's order in favor of appellee Leonard "Dale" Simpson, finding that custody of their two minor children should be modified to joint custody with a week-on week-off visitation arrangement and finding Kristen in contempt. Kristen argues that the circuit court erred in finding a material change in circumstances to warrant a modification of custody, the circuit court erred in failing to make a best-interest finding, and the contempt finding was clearly erroneous. We affirm in part and modify in part.

The parties were married on October 17, 2013, and were separated on or about December 18, 2019. The children subject to the visitation schedule are MC1, born in 2013, and MC2, born in 2015. After the separation, the parties entered into a separation and property-settlement agreement filed of record on March 17, 2020, and incorporated it into the decree of divorce filed of record on March 25, 2020. Dale agreed for Kristen to have

primary custody of the children and for him to have visitation as agreed upon or, if no agreement, by the standard visitation schedule in use by the Benton County courts. The relevant provisions in the Benton County visitation schedule provided for Dale to have visitation with the children every other weekend from Friday at 3:30 p.m. or when school recessed until the following Monday morning at 7:30 a.m. There was no provision for a midweek visit in the court-ordered visitation schedule, but testimony showed that Kristen had agreed to visitation on Tuesday nights. The agreement further provided that "if either party requires a sitter for the children overnight, the other party shall first be given the opportunity to care for the children on each such occasion," and "[f]urther, neither party shall make a derogatory remark about the other party or to a third party in the presence of the children." On March 28, 2022, the court appointed Charles Pearce as the attorney ad litem for the children. At the time of the hearing, MC1 was nine years old, and MC2 was seven years old.

After the divorce, both parties remarried. Dale admitted he had cohabitated with Te'Neyl prior to marriage but testified that Te'Neyl would sleep in the horse trailer when the children were visiting him. Kristen denied she had cohabitated with Caleb Cline, who she married after becoming pregnant. On October 1, 2021, Dale filed a petition for contempt and for modification of the custody to joint custody in which he alleged Kristen was in contempt for not allowing him overnight visitation when she worked the night shift as a dispatcher at the sheriff's office. He also alleged several reasons that custody be modified to joint custody, including alienation of the children; unwillingness to comply with court orders; that she and her husband consumed alcohol in front of the children; that on

2

exchanges of the children, her actions interfered with his visitation by making the children feel guilty to go with him; allowing the children to stay with family members instead of him when she was working; and interfering with his visitation by calling the children excessively during his visitation. Kristen denied Dale's allegations and filed a contempt motion against him for cohabitation with a member of the opposite sex and for consuming alcohol in front of the children.

Dale testified that when the children were four and six, he felt he had been shorted in his time because Kristen came to his vehicle and hugged the children before they left on visitation with him, causing them to be upset and cry. Initially, Dale would pick up MC2 from preschool and pick up MC1 from his school, which released at a later time. Dale testified that Kristen changed that arrangement to require him to pick up MC2 from her home after he picked up MC1. Dale testified the children would be upset and crying when she would tell them, "It's just one day," and he believed it was her attempt to make him look bad or to make them feel guilty for going. Dale testified MC1 would act happy when he picked him up at school, but after Kristen came to the car, he would be upset and standoffish for thirty minutes and up to two hours after the exchange. Dale said he asked her not to do this, but she said she didn't feel like she was doing anything wrong. Dale agreed that he doesn't have that problem as much now since both children are in school where he picks them both up on Fridays.

Kristen testified she altered the exchange because Dale's visitation with MC2 did not begin until 3:30 p.m., so if he picked MC2 up, he was taking her time of possession. Kristen testified that, at times, MC2 would cry when it was time for the exchange, and she would

go to the truck to comfort him, but she had never seen MC1 cry. Kristen testified she would give them a hug, tell them they are going to have a great time, talk about the four-wheelers, ponies, or whatever things they might do, and she would see them in a day. Kristen testified she never whispered anything negative about going on visitation or made any attempt to undermine Dale or to interfere with his visitation by comforting their child, and that she had done nothing wrong by saying goodbye to her children before they left with Dale.

Dale testified that Kristen denied him the right of first refusal to keep the children when she was working the 6:00 p.m. to 6:00 a.m. shift at the sheriff's office in violation of the court order. He stated she left the children with her mother and sometimes her brother when she worked nights.

Kristen did not deny that she had not given him visitation with the children on nights when she was working. Kristen testified that she and her mother live in the same residence, but her mother stays in the garage apartment adjacent to the actual residence. Kristen testified that during their marriage her mother would keep their children. For that reason, she said she thought the provision applied if someone were to go out of town, without the children, or on a business trip, and they needed to hire a babysitter to watch the kids. She based her belief, in part, on the fact that her mother had often kept the children when she and Dale were married, and she thought this would be the same because she is the grandmother and not a sitter. Kristen testified that her work schedule as dispatcher for the sheriff's office had been from 6:00 p.m. until 6:00 a.m., but that changed on April 13, 2021, more than a year before the hearing, when her schedule was changed to 6:00 a.m. to 6:00

4

p.m. on weeknights. Kristen testified that at the time of the hearing, she no longer worked the night shift on weekday nights but was on the day shift.

Dale complained that Kristen was interfering with his visitation by discouraging the children from participating in activities while he had them in his possession. Dale testified that he signed MC1 up for play days and shooting but that Kristen interfered with those activities. He testified that on one occasion, she took him to a movie rather than play day. He testified that this interfered with his visitation and was a manipulation of the children.

Kristen testified that she took MC1 to his play days, even when it was her Friday night. Kristen testified that MC1 missed one rodeo all summer, and she gave MC1 a choice that if he wanted to go to the rodeo, he needed to call his dad, and he could go with him but that she was going to go to the movie at the baseball field. She testified that MC1 chose to go to the movie instead of play day. She testified that at some point, MC1 did not want to go to play days any longer, and she texted Dale and told him.

Dale testified that Kristen does not discuss with him putting the children in activities prior to enrolling them. Dale testified there are problems with Kristen scheduling events during his scheduled time that interferes with things that he had scheduled to do with the boys. He testified that she scheduled MC1 for baseball on his midweek visitation when she had an option to schedule it another time. Dale admitted the option for MC1 to play baseball was either play with older kids during Kristen's time or play on Tuesday nights with his age group. Dale admitted that Kristen traded nights with him from Tuesday night to Monday night so MC1 was able to attend baseball practice on Tuesdays. He testified that after baseball season, they switched back to Tuesday night.

Kristen testified that MC1 was interested in playing baseball, so she signed him up for it. She stated that baseball practice was on Tuesday nights, but she didn't schedule practice or game times. She testified that Dale argued with her that she should have put him on a team of older boys so his visitation would not be impacted. Kristen testified she agreed to trade Tuesday-night visits to Monday nights. She stated that Dale attended some of the practices on Tuesday nights. Kristen stated she had signed the children up for other activities, but she and her husband paid for the activities, such as baseball, riding lessons, basketball, and football.

Dale testified to an incident when MC1 had been at War Eagle camp. He stated that Kristen picked MC1 up from the bus and made him wait in the parking lot until she brought MC1 to him for his weekend visit. Dale testified that this interfered with his visitation because he lost ten to fifteen minutes of visitation time. Dale said he should have been designated as the pick-up person by Kristen since it was his weekend.

Kristen admitted that she talked to MC1 for ten or fifteen minutes after she picked him up from the bus. She stated that she had texted Dale in advance and explained that the rules of the camp stated only the designated person could pick up a child, and she had been designated as that person. Kristen stated that in the text, she asked Dale to give her a few minutes with him before he took him for his visitation and that it would be much appreciated, and Dale texted back that he would get MC1 from her in the parking lot.

Dale testified that he was not made aware of medical appointments; he would get a progress report on the kids, but he was not aware of the appointments so he could attend.

Dale admitted that he did not call Kristen and tell her about MC1's eating acorns and the school nurse sending him home with Dale.

Dale testified that MC1 was given a watch called Gizmo that allowed him to talk and text with his mother, but Kristen called him excessively, and MC1 was always texting her on the watch while at his home.

Dale testified that he had obtained tickets to a Razorback football game because MC1's football team was being recognized during the game. He testified that he invited Kristen and her brother to the game and paid for their tickets. Dale testified that they did not sit together at the game even though they were on the same aisle. Dale also testified that he and Te'Neyl had a canopy that they would set up at MC1's ball games and invite Kristen and Caleb to sit with them. He said although they did sit with them at times, there was little or no interaction.

Te'Neyl testified that she thought Kristen had discouraged MC2 from using the sandbox that Dale and his father had built for him. She said her aunt had bought him toys, and he loved them, but the next weekend he came, he would not play with them. She thought that Kristen's influence over the children allowed her to manipulate them. She also thought the same about MC1's dropping out of play days and his shooting courses. She testified that MC1 loved play days but abruptly decided not to participate, which made her think it was Kristen discouraging him. Te'Neyl explained another instance of Kristen's intractability in working with Dale on trading days for special events. Dale was entered in the American Quarter Horse Association rodeo and asked to trade a weekend so the boys could attend, but Kristen refused.

Caleb testified that he and the children get along like father and sons, and he administers reasonable correction when needed. He testified that they participated in activities with the children, and the boys love their younger brother. Caleb testified they tried to sit with Dale and his wife at events, but it was awkward. He said he and Kristen pay for the children's activities.

Charles Pearce was appointed as attorney ad litem by the court and gave his report to the circuit court at the hearing. He interviewed the children and the parties as well as Andrea Penner, the co-parenting counselor; made in-home visits; and interviewed the children. Penner stated that from her recollection, the parties had great disdain and contempt for each other, which at times, clouded their decision making to the point that they overlooked the best interest of the children. The attorney ad litem report also indicated the parties' animosity towards each other clouded their decision making regarding the children. To reduce conflict, the ad litem recommended that the parties use the Our Family Wizard app or another app to communicate information needed by the other party regarding events and doctor or dental appointments; limit phone calls to the children to once a day; and practice flexibility and communication regarding things like ball games, scheduling, and pickups. The ad litem also recommended that there be no modification of the current custody arrangement, especially since there is a half brother involved, and the children would be separated if there was a modification of custody.

Arkansas law is well settled that the primary consideration in child-custody cases is the welfare and best interest of the children; all other considerations are secondary. *Rice v. Rice*, 2016 Ark. App. 575, 508 S.W.3d 80. A judicial award of custody will not be modified

unless it is shown that there are changed conditions that demonstrate that a modification of the decree will be in the best interest of the child. *Id*. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody; this is to promote stability and continuity in the life of the child and to discourage repeated litigation of the same issues. *Id*. In order to change custody, the circuit court must first determine that a material change in circumstances has occurred since the last order of custody; the party seeking modification has the burden of showing a material change in circumstances. *Id*. If that threshold requirement is met, the circuit court must then determine who should have custody, with the sole consideration being the best interest of the children. *Williams*, 2015 Ark. App. 197, at 10, 458 S.W.3d at 766. Determining whether there has been a change of circumstances requires a full consideration of the circumstances that existed when the last custody order was entered in comparison to the circumstances at the time the change of custody is considered. *Carver v. May*, 81 Ark. App. 292, 101 S.W.3d 256 (2003).

Kristen asserts that none of the observations or concerns expressed by the circuit court constitute a material change in circumstances that would justify a modification in custody. However, this court does not examine each finding cited by a circuit court in isolation. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999). Certain factors, when examined in the aggregate, may support a finding that a change in custody is warranted where each factor, if examined in isolation, would not. *See id*. (holding that the noncustodial parent's remarriage, the custodial parent's move, and the passage of time, when examined in the aggregate, supported a change in custody). Failure of communication,

increasing parental alienation by a custodial parent, and inability to cooperate can all constitute a material change in circumstances sufficient to warrant modification of custody. *Self v. Dittmer*, 2021 Ark. App. 85, at 9, 619 S.W.3d 43, 48; *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751; *Snider v. Snider*, 2024 Ark. App. 317. Alienation occurs when divorcing parents transform a child into a relationship weapon by engaging in patterns of behavior designed to destroy the child's psychological connection with the other parent. *See* Thomas E. Schacht, *Prevention Strategies to Protect Professionals and Families Involved In High-Conflict Divorce*, 22 U. Ark. Little Rock L. Rev. 565, 592 (2000).

The court found from the evidence instances in which Kristen manipulated the children by discouraging them from engaging in activities provided by their father and also referenced Kristen's refusal to allow the boys to attend a significant event in the father's life and share it with him. The circuit court found that Kristen's crawling in the truck with the kids to say goodbye turned into an emotional mess, making the kids emotional wrecks. The court also cited Kristen's failure to give advance notice to Dale so he could attend doctor's appointments as well as her failure to include him in decision-making regarding activities to make sure there were no conflicts with his visitation schedule. The court found that Kristen's actions at the exchange at the War Eagle camp interfered with Dale's visitation. While the court did not make a finding that Kristen had alienated the children from Dale, it noted that if the behavior continued, it would result in alienation. The court also found that Dale and Te'Neyl were credible witnesses, and Kristen was not credible. The court noted immediately after the conclusion of testimony that it was extremely concerned about the damage already done by Kristen, especially to MC1. After considering the evidence,

10

the circuit court found there had been a substantial change in circumstances since the last order and it is in the best interest of the children that custody be modified to joint custody with week-on, week-off visitation by the parties. The circuit court, in its oral opinion, acknowledged that both parties had "remarried well" since the parties' divorce. The circuit court stated that, in its opinion, both stepparents were very highly supportive of the children without overstepping their bounds.

Kristen argues that the circuit court did not consider or give sufficient weight to either her testimony or the testimony of the attorney ad litem. To the extent that Kristen's appeal is a request for us to reweigh the evidence, it is well settled that we will not reweigh the evidence on appeal, and credibility determinations are left to the circuit court. *Fulmer v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 56, 660 S.W.3d 347.

After review of the court's findings, the record as a whole, and the applicable case law, we conclude that the court's finding of a material change in circumstances is not clearly erroneous. As we held in *Wallis v. Holsing*, 2023 Ark. App. 137, at 5, 661 S.W.3d 284, 288, the failure of communication, increasing parental alienation by a custodial parent, and inability to cooperate can all constitute a material change in circumstances sufficient to warrant modification of custody. *See Self*, *supra*; *Szwedo v. Cyrus*, 2020 Ark. App. 319, 602 S.W.3d 759; *Montez v. Montez*, 2017 Ark. App. 220, 518 S.W.3d 751. Further, we have held that the combined, cumulative effect of particular facts may together constitute a material change. *Shannon v. McJunkins*, 2010 Ark. App. 440, at 10, 376 S.W.3d 489, 494; *see also McCoy v. Kincade*, 2015 Ark. 389, at 5, 473 S.W.3d 8, 11.

Kristen next argues that the court erred in failing to conduct a best-interest analysis. The order modifying custody specifically found that it was in the best interest of the children for custody to be modified to joint custody. The order itself did not set forth the reasons for finding best interest, but the remarks of the circuit court setting out its reasons for modification were clear that the best interest of the children were considered at the conclusion of the trial. When a circuit court's opinion is practically silent regarding findings of fact regarding best interest, we presume that the circuit court made the findings necessary to support its judgment. *Emis v. Emis*, 2017 Ark. App. 372, at 9, 524 S.W.3d 444, 450; *Skinner v. Shaw*, 2020 Ark. App. 407, at 12, 609 S.W.3d 454, 461. In this case, the circuit court made findings of fact that support by clear and convincing evidence that Kristen had engaged in a pattern of behavior intended to manipulate the children to reject activities supported by Dale, to make demands that Dale pick the children up at her home rather than at school in order for her to engage in conduct that upset the children and made them feel guilty for enjoying time with Dale; to refuse to notify Dale to allow him to be present at medical appointments; failing to follow the court order that Dale would have right of first refusal to have the children while she was working the night shift; and interfering with his visitation when MC1 returned from War Eagle camp. The circuit court found, "I feel like Mrs. Cline has done so much damage to this relationship [father/child] that I don't know how to undo it. That is what's been going on and when I say the damage is done, it has been and most especially with MC1." The circuit court specifically found that damage had been done to the father-child relationship by Kristen's manipulative actions, and it would be in the children's best interest for custody to be modified to joint custody. We cannot

12

conclude on this record that awarding joint shared physical custody was clearly erroneous. *Hoover v. Hoover*, 2016 Ark. App. 322, 498 S.W.3d 297. It is clear from the circuit court's oral findings that it carefully and thoughtfully weighed whether the modification of custody would be in the children's best interest, and we give significant weight to the circuit court's superior position to observe witnesses and determine issues related to the welfare of the children.

Kristen also argues that the circuit court's orders amounted to a reward for Dale and a punishment for Kristen, which runs afoul of the rule that "[c]ustody awards are not made to punish or reward either parent." *Black v. Black*, 2015 Ark. App. 153, at 9, 456 S.W.3d 773, 778. We find no evidence that the change of custody was a reward or punishment. The determination by the circuit court established joint custody between the parties, which is favored as a matter of policy and law in Arkansas. *See* Ark. Code Ann. § 9-13-101(a)(1)(A)(iii) (Supp. 2023).

The circuit court also found Kristen in contempt of court for her actions. The circuit court sentenced her to fourteen days in the Benton County Jail and ordered her to pay Dale attorney's fees of $6,500. The court found Kristen would be permitted to purge herself of contempt by complying with all orders of the court and by fostering the relationship between the children and their father and his household.

In determining whether a particular action by a court constitutes criminal or civil contempt, the focus is on the character of relief rather than the nature of the proceeding. *Fitzhugh v. State*, 296 Ark. 137, 138, 752 S.W.2d 275, 276 (1988). Because civil contempt is designed to coerce compliance with the court's order, the civil contemnor may free

himself or herself by complying with the order. *See id.* at 139, 752 S.W.2d at 276. This is the source of the familiar saying that civil contemnors "carry the keys of their prison in their own pockets." *Id.* (quoting *Penfield Co. v. S.E.C.* 330 U.S. 585, 593 (1947)). Criminal contempt, by contrast, carries an unconditional penalty, and the contempt cannot be purged. *Fitzhugh*, 296 Ark. at 139, 752 S.W.2d at 276–77. Because we conclude that Kristen was held in civil contempt, we apply the standard of review for civil contempt. Our standard of review for civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. *See Gatlin v. Gatlin*, 306 Ark. 146, 811 S.W.2d 761 (1991).

It is well settled that suspension of a sentence for contempt is, in effect, a complete remission of the contempt. *Henry v. Eberhard*, 309 Ark. 336, 832 S.W.2d 467 (1992). In *Higgins v. Merritt*, 269 Ark. 79, 598 S.W.2d 418 (1980), the appellant was found to be in contempt and was sentenced to two days in jail, with the sentence suspended. The supreme court declined to reach the contempt issue on appeal, writing:

> It is first argued that on the proof the chancellor erred in finding the appellant to be in contempt. We do not reach the merits of this argument, because an attempt to suspend the execution of a sentence for contempt of court, other than a mere postponement, is invalid and amounts to a complete remission of the punishment. The point being moot, the decree is accordingly modified to set aside the sentence for contempt.

*Higgins*, 269 Ark. at 80, 598 S.W.2d at 419.

In *Henry*, *supra*, the supreme court held that if the suspended sentence is suspended conditionally for a specific period of time, the suspension amounts to a mere postponement rather than a remission. The effect of these supreme court holdings is that a circuit court cannot *indefinitely suspend* a contempt sentence but can conditionally postpone a sentence for a *specified period of time*. *See Kilman v. Kennard*, 2011 Ark. App. 454, 384 S.W.3d 647.

14

In the final order, for each of its findings of contempt against Kristen, the circuit court sentenced her to fourteen days in the Benton County Jail and ordered her to pay to Dale attorney's fees of $6,500, suspended on the condition she never again disregard the court's orders. The court stated she would be permitted to purge herself of contempt by complying with all orders of the court and by fostering the relationship between the children and their father and his household and supporting the court order.

We find this suspension was for an indefinite time period and amounted to a complete remission of the contempt and punishment and, therefore, do not reach the merits of this argument. The point being moot, the decree is accordingly modified to set aside the sentence for contempt.

Affirmed in part; modified in part.

VIRDEN and KLAPPENBACH, JJ., agree.

*Matt Kezhaya* and *Sonia Kezhaya*, for appellant.

*Tim Cullen*, for appellee.